# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of Provco Pinegood     :
Sumneytown, LLC From the     :
Decision Dated November 19, 2018     :
of the Board of Commissioners of     :     No. 1251 C.D. 2019
Upper Gwynedd Township     :     Argued: November 9, 2020
    :
Appeal of: Provco Pinegood     :
Sumneytown, LLC     :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE ANNE E. COVEY, Judge (P.)
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**             **FILED: December 14, 2020**


Provco Pinegood Sumneytown, LLC (Objector) appeals from the August 8, 2019 Order of the Court of Common Pleas of Montgomery County (common pleas), which denied Objector's appeal from the order of the Board of Commissioners (Board) of Upper Gwynedd Township (Township) approving a conditional use application (Application) filed by Upper Gwynedd Equities, LLC[1] (Applicant). Applicant owns a 4.56-acre tract of land situated at 467 Sumneytown Pike

---

[1] At the time the Application was filed, Giant Food Stores, LLC owned the Property and Hartford Properties, LLC, which filed the Application, was the equitable owner of the Property. After the Application was approved, Upper Gwynedd Equities, LLC completed the purchase of the Property. Hartford Properties, LLC and Upper Gwynedd Equities, LLC have the same managing member. Accordingly, we will refer to Upper Gwynedd Equities, LLC as Applicant throughout this Opinion.

(Property), which is within the Township's C Commercial Zoning District. Applicant proposes to develop and operate the Property with a gasoline service station with convenience store and four multi-tenant buildings (Development). Under the Township's zoning ordinance (Ordinance), a conditional use permit is required for the development of property with multiple principal uses in the C Commercial Zoning District. On appeal, Objector argues Applicant did not meet its burden of demonstrating the criteria for the grant of a conditional use permit and, therefore, the Board erred in granting the Application. Specifically, Objector submits Applicant did not demonstrate: (1) that the proposed multiple principal uses are "compatible[] and will not conflict," as required by Section 195-22.A.(9)(a)[3] of the Ordinance; and (2) that the Development would not "materially increase traffic congestion on the streets" as required by Section 195-27.1(E) of the Ordinance. Upon review, we conclude Applicant met its burden of demonstrating the foregoing and, therefore, the Board did not err in granting the Application.

## I. Factual Background and Procedure

### A. Application

Applicant submitted the Application to the Board on July 9, 2018, therein requesting a conditional use permit to develop and operate the Property with multiple principal uses. (Decision, Findings of Fact (FOF) ¶ 3.) The Property is located at the corner of Church Road and Sumneytown Pike. Sumneytown Pike is comprised of two eastbound traffic lanes and two westbound traffic lanes, and a dedicated left-turn lane on the westbound side for turns onto Church Road. "The properties surrounding the [Property] include a dry-cleaning business, Sunoco gas station, former tavern, formal wear store, apartment buildings, and a parcel used for PECO

2

power lines." (*Id.* ¶ 17.) Currently situated on the Property is a former 32,000-square-foot grocery store building, which was operated by Giant Food Stores, LLC (Giant), and a gasoline service station pad site, both of which have been vacant for three years. (*Id.* ¶¶ 2, 15.) A predecessor in title to Giant was granted approval to expand the grocery store building to 51,000 square feet and to build a gasoline service station; however, that construction never took place. (*Id.* ¶¶ 18-20.) Applicant proposes to demolish the current improvements and construct

> a gasoline service station having sixteen (16) fueling locations with a 5,000[-]square[-]foot canopy and an associated 4,637[-]square[-]foot convenience store, two (2) 6,000[-square-]foot commercial multi-tenant buildings, a 5,000[-]square[-]foot commercial multi-tenant building, an 8,000[-]square[-]foot commercial multi-tenant building, paved parking areas and drive aisles, concrete sidewalks, storm water management facilities and related improvements . . . .

(*Id.* ¶ 4.) For ingress and egress, Applicant proposes a right-in, right-out access drive on Sumneytown Pike and a full movement access drive on Church Road.

### B. Hearings before the Board

The Board considered the Application at its August 27, 2018, September 24, 2018, and October 15, 2018 meetings. At the start of the August 27, 2018 hearing, the Board granted party status to Objector and Merck Sharpe & Dohme Corp. (Merck),[2] both of which own property diagonally across the street from the Property. (*Id.* ¶ 6.) After granting party status to these objectors, the Board turned to the parties' witnesses.

Applicant presented four witnesses before the Board. First, Applicant presented the testimony of its Managing Member, Robert Hill, who testified as to

---

[2] Merck is not participating in the appeal before this Court.

the ownership interest of the Property.[3]  Second, Applicant presented the testimony of its Principal Project Engineer (Engineer), Michael E. Jeitner, who was accepted as an expert witness in civil engineering.[4]  Engineer testified Applicant planned to construct the Development in a single phase and that the Development will not contain any residential uses.  (Reproduced Record (R.R.) at 55a, 58a; *see also* FOF ¶¶ 44, 47.)  He further testified that the only known tenant of the Development was that of the gasoline service station.  (R.R. at 66a.)  When asked whether the Property "is comprised of sufficient area for the operation of the requested principal uses," Engineer responded that it is.  (R.R. at 54a; *see also* FOF ¶¶ 42, 47.)  Engineer agreed that the issue of whether the proposed multiple uses are compatible and do not conflict is outside the scope of his expertise as a civil engineer.  (R.R. at 69a.)

Third, Applicant presented the testimony of Charles Guttenplan, who was accepted by the Board as an expert in land planning (Land Planner).[5]  Land Planner testified that "at this time or juncture, we don't know who all the tenants are, but they would be permitted uses or conditional uses or special exception uses that are currently allowed in [the] C Commercial District."  (R.R. at 97a; *see also* FOF ¶¶ 61-62.)  However, he represented that the Development would not include a greenhouse, nursery yard, or the wholesaling storage and sale of lumber, plumbing, and other building materials.  (R.R. at 97a-98a; *see also* FOF ¶¶ 61-62.)  He testified that the proposed multiple principal uses are compatible as all are permitted in the C Commercial Zoning District.  (R.R. at 109a; *see also* FOF ¶ 72.)  When asked how he determined if the multiple principal uses are compatible, Land Planner answered:

---

[3] The testimony of Managing Member can be found on pages 19a-20a of the Reproduced Record.

[4] The testimony of Engineer can be found on pages 21a-88a of the Reproduced Record.

[5] The testimony of Land Planner can be found on pages 93a-118a of the Reproduced Record.

4

Well, I think [of this] a couple of different ways. I think, first of all, the fact that the [T]ownship has allowed these various uses in a C Commercial District without any indication that they have to be separated, I think there's been a legislative determination that these are potentially compatible uses.

I think by the fact that the [A]pplicant is willing to eliminate the [] uses that could be considered less compatible, . . . I think that leaves all the other uses potentially compatible.

I don't see any difference between this small shopping center and any other shopping center. We see a potential mix of retail, personal service shops, restaurants, convenien[ce] store[s]. There are many, many shopping centers including new and old ones that have these kind of mixed uses and they operate very compatible with each other.

(R.R. at 109a-10a.)

Last, Applicant presented the testimony of John Wichner, who was accepted by the Board as an expert in traffic (Traffic Engineer).[6] Traffic Engineer testified that, using the Trip General Manual of the Institute of Transportation Engineers, he estimated the daily trips to the Property under the previously operated Giant grocery store and gas station, the daily trips that would have been generated if the grocery store and gas station had been expanded as proposed and approved for Giant's predecessor, and the daily trips that will be generated by the Development. Traffic Engineer's Trip Generation Comparison was admitted into the record. As reflected on the Trip Generation Comparison, Traffic Engineer estimated the daily trips to the Property under the previously operated Giant grocery store and gas station to be **3,956**. (R.R. at 382a.) He estimated the daily trips to the proposed expanded and approved, but not constructed, grocery store and gas station would have been **6,543**.

---

[6] The testimony of Traffic Engineer can be found on pages 146a-243a, 272a-82a, and 321a-45a of the Reproduced Record.

5

(*Id.*) Traffic Engineer estimated the daily trips to the Property for the Development would be between **4,855 and 5,063**, depending on the particular uses in the Development. (*Id.*) Thus, he concluded the Development would produce between 899 and 1,107 **new** daily trips to the Property as compared to the previous Giant grocery store and gas station and between 899 and 1,107 **fewer** daily trips as compared to the proposed expanded and approved, but not constructed, grocery store and gas station. (*Id.*; *see also* FOF ¶¶ 93-94.) Traffic Engineer testified that the Township previously made improvements to Sumneytown Pike in 2009, 2010, or 2011, in contemplation of the expansion of the grocery store building and gas station by Giant's predecessor. (R.R. at 168a; *see also* FOF ¶¶ 99-100.) He opined that if these improvements were able to accommodate the daily trips generated by the proposed expanded and approved, but not constructed, grocery store and gas station, which he estimated would produce higher trips than the Development, the surrounding roads could accommodate the daily trips attributable to the Development. (R.R. at 169a; *see also* FOF ¶¶ 99-100.) Traffic Engineer also completed a Traffic Impact Study, which was admitted into the record, wherein he estimated the number of daily trips through the intersection of Church Road and Sumneytown Pike would increase, in part, because of the Development but that the increase would not be a material increase from the current numbers. (R.R. at 178a-79a; *see also* FOF ¶¶ 113, 115.)

As to ingress and egress, Traffic Engineer testified that the access drive on Sumneytown Pike would be a right-in, right-out drive and that there would be a concrete median "to physically restrict any kind of illegal movements." (R.R. at 181a.) He also testified that both the Sumneytown Pike access drive and the full movement access drive on Church Road have "adequate sight distance." (*Id*. at

6

180a.) He opined the two access sites "will adequately operate to allow for safe access to the site." (R.R. at 203a.) He stated that there currently exists a 125-foot dedicated left-turn lane on Church Road for access to the Property and that a 75-foot dedicated left-turn lane is required; therefore, the existing left-turn lane is adequate. (R.R. at 181a-82a; *see also* FOF ¶ 120.) He also testified that the full access drive on Church Road would be blocked by traffic during 16% of the peak afternoon traffic hour, thus blocking left turns into the Property from Church Road, but that the traffic signal at the intersection of Church Road and Sumneytown Pike would "clear out the queue and allow the ins and outs to be made safely." (R.R. at 207a, 272a, 274a; *see also* FOF ¶¶ 132, 148.) As to Sumneytown Pike, he estimated that the delay in making a left turn from Sumneytown Pike onto Church Road to access the site would increase from 49.1 seconds to 114.3 seconds. (R.R. at 231a-32a; *see also* FOF ¶ 135.) He estimated the queue for this lane would increase from 278 feet to 715 feet. (R.R. at 235a; *see also* FOF ¶ 139.)

Merck presented the testimony of Eileen Collins, who was accepted by the Board as a traffic expert (Merck's Traffic Expert).[7] Merck's Traffic Expert stated that Applicant underestimated the anticipated trip generation attributable to the Development. According to Merck's Traffic Expert, the Development would produce 789 more weekday trips than estimated by Applicant. (R.R. at 291a-92a; *see also* FOF ¶ 156.) She testified that the Development would further contribute to the left-turn queues, which already exceed their capacity at peak times. (R.R. at 296a-97a; *see also* FOF ¶ 159.) When asked whether the increases to the queues are significant and material, Merck's Traffic Expert opined that they are. (R.R. at 297a;

---

[7] The testimony of Merck's Traffic Expert can be found on pages 284a-308a of the Reproduced Record.

*see also* FOF ¶ 164.)  Merck's Traffic Expert further opined that the Development will materially increase traffic congestion on the streets, because of

> the oversaturated turn lanes that are most likely going to spill into the through lane causing excessive congestion, poor levels of service at the Sumneytown Pike/Church Road intersection for the left-turn movements, and blocking of the site's access driveways by the queues of the intersection.

(R.R. at 300a-01a; *see also* FOF ¶ 164.)  Merck's Traffic Expert proposed several offsite improvements to the surrounding roads that would help mitigate the Development's traffic impacts.

Merck also presented the testimony of its Director of Global Facilities Management, Nancy Bednarik,[8] who expressed traffic concerns.  She testified that Merck currently employs 11,000 workers at its property, which is diagonally across Sumneytown Pike from the Property, and that the improvements previously made to Sumneytown Pike could accommodate an additional 3,000 employees.  (R.R. at 313a; *see also* FOF ¶ 176.)  She stated the Board should consider the level of traffic in its review of the Application.  (R.R. at 319a; *see also* FOF ¶ 177.)

While Objector did not present testimony or evidence before the Board, it did cross-examine some of the witnesses and present closing remarks.

C. Board's Decision

On November 19, 2018, the Board issued its decision and order finding Applicant met its burden for approval of the Application.  Therein, the Board made 186 findings of fact describing the Property, the Development, and the surrounding

---

[8] The testimony of Merck's Director of Global Facilities Management can be found on pages 309a-19a of the Reproduced Record.

area, as set forth above, and summarized the testimony of the foregoing witnesses. Additionally, the Board found "Applicant intends that all tenants which will occupy the Development's multi-tenant buildings will engage in uses" permitted in the C Commercial Zoning District except those uses Applicant's Land Planner stated would not be in the Development. (FOF ¶ 61.) The Board found that "[t]he[] multiple principal uses are generally of a type that will be compatible with each other" as all are permitted in the C Commercial Zoning District. (*Id.* ¶ 72.)

As to traffic, the Board did not make explicit credibility findings, but apparently credited the testimony of Applicant's experts, as it found: (1) the Property "is comprised of sufficient area for the internal circulation of" traffic on the Property; (2) the Development "will not materially increase the traffic congestion on the streets in the area because the Development's impact on the level of service calculations for the surrounding intersections is minimal"; (3) "the total percentage of the overall additional trips . . . estimated to be attributable to the Development[] is low"; and (4) the two access drives will "provide adequate egress from the [Property] and protect the streets from undue congestion and hazard because of their design . . . ." (*Id.* ¶ 130(a), (b), (c).)

In addition to the relevant findings of fact, the Board made the following relevant conclusions of law:

> 7. After reviewing all of the testimony and exhibits, the Board finds that the Applicant has met its burden by demonstrating compliance with the specific criteria of Section 195-22.A.(9)(a) and Section 195-27.1 of the . . . Ordinance. . . . The [Property] is comprised of 4.56 acres, more or less and contains sufficient area for the multiple uses of the Development . . . . Generally, the uses potentially included in the Development by virtue of being permitted on the [Property] by right, special exception or conditional use by the [] Ordinance are compatible, except for those uses prohibited by the [o]rder hereinafter provided. . . .

9

8. In the opinion of the Board, the testimony and evidence presented at the Hearing established that the Development, as conditioned in the following [o]rder, is suitable for the property, fits with the character of the neighborhood, does not over-burden the public service facilities, does not materially increase traffic congestion as compared to no-build scenarios and will not adversely affect the public health, safety and welfare of the community.

9. It is the Board's specific finding therefore that the requested conditional use to permit the development of the [Property] with multiple principal uses . . . as conditioned by the following [o]rder, is in the best interest of this Township and is not likely to result in any unanticipated adverse effect to the public, safety and welfare. . . .

(Decision, Conclusions of Law (COL) ¶¶ 7-9.) In an order accompanying its decision, the Board imposed several conditions on its approval of the Application. Relevant to the issues raised in this appeal, the Board, "[i]n order to ensure the compatibility of the uses on the [Property]," determined the following uses are not permitted: clubs, fraternal organizations or lodges; hotels, boardinghouses, rooming houses, tourist homes or motels; public garages or automobile repair shops, new or used car sales; undertaking establishments; residential uses; greenhouses or nursery sales yards; wholesaling storage and sale of lumber, plumbing and other building materials and supplies; sales of fireworks; drive-thru facilities (other than the sale of gasoline, to the extent that sale is considered to be a drive-thru activity); and day cares for children and seniors. (Board's Order ¶ 3.)

Objector appealed the Board's grant of the Application to common pleas.

10

D. Common pleas' decision

After submission of briefs, common pleas held oral argument on Objector's appeal on July 22, 2019. Without taking additional evidence, common pleas denied Objector's appeal by Order dated August 8, 2019. Objector then initiated the instant appeal with this Court. Common pleas ordered Objector to file a statement of errors complained of on appeal. After receiving Objector's statement, common pleas issued an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a) (1925(a) Opinion), therein addressing the two issues raised by Objector. First, Objector argued Applicant did not demonstrate the proposed multiple principal uses in the Development are compatible and will not conflict as required by Section 195-22.A.(9)(a)[3] of the Ordinance. On this issue, common pleas concluded "that the requirements that the multiple principal uses be compatible and non-conflicting are non-specific and subjective" and, therefore, that requirement "is either not enforceable against [Applicant] or [O]bjector[] had the initial burden on this issue." (1925(a) Opinion (Op.) at 6.) Notwithstanding, common pleas also concluded "the uses proposed by [Applicant] are of the type permitted in the C Commercial District, and the Board conditioned approval by prohibiting certain uses in order to ensure compatibility." (1925(a) Op. at 7.)

Second, Objector argued that there was not substantial evidence to support the Board's findings that the Development will not materially increase traffic. Common pleas concluded "the phrases 'materially increase' and 'traffic congestion,'" as required by Section 195.27.1(E) of the Ordinance, "are too vague to permit [Applicant] to know what is required of it" and, therefore, that requirement, too, is not enforceable against Applicant. (1925(a) Op. at 8.) Instead, common pleas determined that this requirement goes to the issue of public welfare and, therefore,

11

it was the burden of Objector to demonstrate any detrimental effect to the public. (*Id.*)

## II. Parties' Arguments

On appeal, Objector submits Applicant did not meet its burden for the grant of a conditional use permit and the Board erred by concluding otherwise. First, Objector argues Applicant did not meet its burden of demonstrating the proposed multiple principal uses are compatible and non-conflicting, as required by Section 195-22.A.(9)(a)[3] of the Ordinance. Objector contests the Board having granted the Application without requiring Applicant to identify the proposed uses contained in the Development. According to Objector, "different principal uses could have different impacts" and "[w]ithout identifying each of the uses that will be located on the [] Property, [Applicant] could not, and did not demonstrate compliance with the requirements of" Section 195-22.A.(9)(a)[3] of the Ordinance. (Objector's Brief (Br.) at 21-22.) Objector argues that all of the individual uses permitted in the C Commercial Zoning District are not all inherently compatible with one another and "if that w[as] the case, there would be no reason for the . . . requirement that an applicant for conditional use approval demonstrate that the proposed multiple principal uses would be compatible and would not conflict." (*Id.* at 13.) Objector disagrees with common pleas' conclusion that the Ordinance's requirements in Section 195-22.A.(9)(a)[3] are subjective. Even if the requirement is subjective, and Objector had the burden of demonstrating the proposed uses were not compatible and conflicted, Objector contends "it would have been impossible for [it] to demonstrate that those unidentified multiple principal uses would not be compatible and would conflict." (*Id.* at 22.)

12

Second, Objector argues Applicant did not meet its burden of demonstrating that the Development would not "materially increase traffic congestion on the streets" as required by Section 195.27.1(E) of the Ordinance. While the Board concluded that the Development does not materially increase traffic congestion, Objector contends this conclusion is not supported by substantial evidence. Citing the testimony of Applicant's Traffic Engineer, Objector asserts the Development "will materially increase traffic congestion from that which exists today." (Objector's Br. at 25 (emphasis omitted).) Objector disagrees with common pleas' conclusion that Section 195-27.1(E) of the Ordinance is a subjective requirement.

Applicant responds that it did meet its burden for the grant of a conditional use permit and, therefore, the Board did not err in granting the Application. First, Applicant argues that Section 195-22.A.(9)(a)[3] of the Ordinance is either vague and unenforceable or is a subjective requirement and Objector has the burden of proving the proposed uses are not compatible and would conflict. Applicant asserts the Ordinance does not define "compatible," "conflict," nor "non-conflicting" or provide any specific or objective criteria to determine whether multiple principal uses would be compatible and do not conflict. (Applicant's Br. at 23.) Alternatively, if Section 195-22.A.(9)(a)[3] of the Ordinance is enforceable and the burden is on Applicant to demonstrate the requirements therein, Applicant contends it "provided testimony and evidence that the proposed multiple uses would be those permitted in the C Commercial District but for a greenhouse, nursery sales yard and wholesaling, storage and sale of lumber and other building materials and supplies" and that all permitted uses in the C Commercial District are "inherently compatible."[9] (Applicant's Br. at 24-25.) Contrary to Objector's argument, Applicant takes the

_____

[9] The Board joins in the part of Applicant's brief related to there being evidence to support the finding that the proposed uses are compatible and non-conflicting.

13

position that the Ordinance does not require Applicant to identify "specific tenants . . . only the uses." (*Id.* at 25.) Having met its initial burden of demonstrating the proposed multiple principal uses are compatible and non-conflicting, Applicant asserts the burden would have then shifted to Objector to demonstrate that the proposed multiple principal uses are not compatible and, in fact, conflict. Applicant contends Objector did not meet this burden and points out "Objector provided no testimony or evidence at the [h]earings that the proposed uses are not compatible or conflict." (*Id.* at 26.)

Additionally, Applicant argues Section 195.27.1(E) of the Ordinance is either vague and unenforceable or is a subjective requirement and Objector has the burden of proving the Development would materially increase traffic. Applicant argues the Ordinance does not define "materially increase" or "traffic congestion" nor does it provide any specific or objective criteria to determine whether the Development would materially increase traffic. (Applicant's Br. at 23.) Alternatively, if Section 195-27.1(E) of the Ordinance is enforceable and the burden is on Applicant to demonstrate the requirement therein, Applicant contends it represented sufficient evidence to establish that the Development would not materially increase traffic.[10] Having met its initial burden, Applicant argues the burden then shifted to Objector to demonstrate the Development would generate traffic not normally generated by this type of use. Applicant submits Objector did not meet this burden and again points out "Objector presented no witnesses or exhibits as to traffic." (Applicant's Br. at 32-33.)

---

[10] The Board joins in the part of Applicant's brief related to there being evidence to support the finding that the Development will not materially increase traffic.

## III. Discussion

We begin by recounting the law related to conditional uses and our role in reviewing the grant or denial of a conditional use application. "A conditional use is nothing more than a special exception which falls within the jurisdiction of the municipal governing body rather than the zoning hearing board." *In re Thompson*, 896 A.2d 659, 670 (Pa. Cmwlth. 2006). Like a special exception, a conditional use is not an exception to a zoning ordinance, "but rather a use to which the applicant is entitled provided the specific standards enumerated in the ordinance for the [conditional use] are met by the applicant." *Id.* "The fact that a certain use is permitted as a conditional use evidences a legislative determination that such use would not have an adverse impact on the public interests in normal circumstances." *Joseph v. N. Whitehall Twp. Bd. of Supervisors,* 16 A.3d 1209, 1215 (Pa. Cmwlth. 2011). The

> applicant for conditional use approval has the burden of establishing compliance with the specific, objective criteria of the zoning ordinance. Once that burden is satisfied, the applicant has made out a prima facie case and must be granted a conditional use, unless the objectors present sufficient evidence that the proposed use will have a detrimental effect on the public health, safety and welfare.

*Id.* (citation omitted). In granting a conditional use permit, a governing body "is permitted to impose [reasonable] conditions on the use of a property to mitigate any potential adverse impacts from the proposed use, and is required to reduce the negative impacts to an acceptable level[,] if it can, by imposing conditions." *In re Maibach, LLC*, 26 A.3d 1213, 1216 (Pa. Cmwlth. 2011).

> In conditional use cases where common pleas took

> no additional evidence, our scope of review . . . is limited to a determination of whether the [governing body] . . . committed an abuse

15

of discretion or an error of law. An abuse of discretion is established where the findings are not supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*In re Richboro CD Partners, L.P.*, 89 A.3d 742, 746 n.1 (Pa. Cmwlth. 2014) (citation omitted). In reviewing this matter, we are mindful that the Board "is the ultimate fact-finder and the exclusive arbiter of credibility and evidentiary weight." *Joseph*, 16 A.3d at 1218. We may not substitute the Board's interpretation of the evidence with our own and "must view the evidence in a light most favorable to" Applicant, which prevailed before the Board. *Marshall v. Charlestown Twp. Bd. of Supervisors*, 169 A.3d 162, 169 (Pa. Cmwlth. 2017). Further, we must "give great weight and deference" to the Board in its interpretation of the Ordinance as it is the body "charged with the duty to execute and apply the [sections] at issue." *In re Thompson*, 896 A.2d at 669. Although the Board is entitled to deference in interpreting the Ordinance, "any ambiguity and conflict in the language of the [O]rdinance must be resolved in the favor of [Applicant] and the least restrictive use of the land." *Reihner v. City of Scranton Zoning Hearing Bd.*, 176 A.3d 396, 400 (Pa. Cmwlth. 2017).

The crux of this appeal is whether Applicant met its burden for the grant of a conditional use permit. Initially, it is necessary to review the relevant provisions of the Ordinance. Section 195-22.A of the Ordinance sets forth the permitted uses in the C Commercial Zoning District. Section 195-22.A provides:

A. Use regulations. A building may be erected, altered or used and a lot or premises may be used for any one of the following purposes and no other:

(1) Retail sale of dry goods, variety and general merchandise, clothing, food, including restaurant without drive-thru, flowers, beverages, drugs, household supplies or furnishings, sale or repair

16

of jewelry, watches and clocks, optical goods or musical, professional or scientific instruments, job printing, bakery, tutorial services, personal service business (including but not limited to hair salon, nail salon, massage or facial or skin treatments), appliance store, retail sale of pets and/or pet products and services, hardware store, cabinet showroom and sales, dry cleaning, bank or financial institution[] (without a drive thru), medical or dental offices (including but not limited to emergency or urgent care or surgery centers), physical therapy facilities and any other use of the same general nature as those specifically enumerated in this section.

(2) Barbershops, hairdressing establishments and such other shops in the personal service category.

(3) Business or professional offices or studios.

(4) Club, fraternal organization or lodge.

. . . .

(7) Accessory use on the same lot with and customarily incidental to the use permitted and utilized.

(8) The following uses when authorized as a special exception:

   . . . .

   (b) A laundromat or dry-cleaning establishment, provided that no flammable fluids are used.

   (c) Gasoline service station, storage or public garage or automobile repair shop.

   (d) New or used car sales.

   (e) Undertaking establishment.

   (f) Educational, religious or philanthropic use.

   (g) Financial institution.

17

(h) A combined commercial and single-family residential use in one structure, provided that the commercial use shall be of the type permitted in [Section] 195-22[.]A. [of the Ordinance]

(i) A car-wash facility . . .

(j) Post office.

(k) The dispensing of medical marijuana by a dispensary . . . .

(9) The following uses when authorized as a conditional use and subject to the express criteria in connection therewith and the conditional use standards contained in Section 195.27.1 [of the Ordinance]:

(a) Multiple principal uses on a single lot, provided that:

[1] The lot is comprised of sufficient area for the internal parking and circulation of employees, contractors, suppliers, patrons, guests and customers;

[2] The lot is comprised of sufficient area for the operation of the requested principal uses;

[3] **The multiple principal uses are compatible, and will not conflict;**

[4] Multiple principal uses are not permitted to include a residential use;

[5] The total required parking on the lot shall be the sum of each individual parking requirements, in accordance with Section 195-28 [of the Ordinance], except that the parking requirements for C-Commercial lots developed with five or more establishments shall comply with Section 195-28.A(11) [of the Ordinance].

(b) Full service, full amenity hotel, restaurant with drive-thru, bank or financial institution with drive-thru, day care or children or seniors, or tavern.

(c) Greenhouse or nursery sales yard.

(d) Wholesaling, storage and sale of lumber, plumbing and other building materials and supplies.

(Emphasis added).

Section 195-27.1 of the Ordinance, entitled "conditional use standards," provides the following:

[W]here the Board . . . is required to consider a conditional use of the [] Ordinance . . . , the Board . . . shall, among other things:

A. Consider the suitability of the property for the use desired. Assure itself that the proposed change is consistent with the spirit, purpose and intent of this chapter.

B. Determine that the proposed change shall not substantially injure or detract from the use of neighboring property or from the character of the neighborhood, and that the use of the property adjacent to the area included in the proposed change or plan is adequately safeguarded.

C. Determine that the proposed change will serve the best interests of the Township, the convenience of the community, where applicable, and the public welfare.

D. Consider the effect of the proposed change upon the logical, efficient and economical extension of public service and facilities, such as public water, sewers, police and fire protection and public schools.

E. **Consider the suitability of the proposed use with respect to whether the use would materially increase traffic congestion of the streets and assure adequate access arrangements in order to protect streets from undue congestion and hazard**.

(Emphasis added.)

A. Whether the Board erred in finding the proposed multiple principal uses are compatible and non-conflicting.

First, Objector submits the Board erred in finding the proposed multiple principal uses in the Development are compatible and non-conflicting. In particular, Objector argues that Applicant did not identify the specific proposed multiple principal uses and, therefore, there was no way for Applicant to meet its burden of demonstrating the proposed multiple principal uses are compatible and non-conflicting. Upon review, we conclude the Board did not err in concluding that the proposed multiple principal uses are compatible and non-conflicting. Contrary to Objector's argument, Applicant **did** identify the potential proposed uses of the Development. In its Application, Applicant stated the Development would contain only uses permitted in the C Commercial Zoning District. (R.R. at 375a.) Likewise, Land Planner's testimony before the Board supports the representation made by Applicant in the Application. He testified that "at this time or juncture, we don't know who all the tenants are, but they would be permitted uses or conditional uses or special exception uses that are currently allowed in [the] C Commercial District." (R.R. at 97a; *see also* FOF ¶¶ 61-62.) He represented the Development would not include a greenhouse, nursery yard, or the wholesaling storage and sale of lumber, plumbing, and other building materials. (R.R. at 97a-98a; *see also* FOF ¶¶ 61-62.) Therefore, Applicant **did** identify the potential uses to be contained in the Development. While Applicant did not identify the specific tenants of the multi-tenant buildings as Objector may have liked, there is no indication that the Ordinance requires an applicant for a conditional use permit to identify each specific tenant, only the use.

The Board found that the proposed uses are inherently compatible "by virtue of being permitted on the [Property] by right, special exception or conditional use

20

by the [] Ordinance." (Decision, COL ¶ 7.) This interpretation is consistent with the well-established principle that "the fact that a certain use is permitted . . . evidences a legislative determination that such use would not have an adverse impact on the public interests in normal circumstances." *Joseph*, 16 A.3d at 1215. We must give deference to the Board's reasonable interpretation of its own ordinance. *In re Thompson*, 896 A.2d at 669. Therefore, we conclude Applicant met its burden of satisfying Section 195-22.A.(9)(a)[3] by demonstrating that the Development will be occupied only by tenants employing uses permitted in the C Commercial Zoning District.

We are not persuaded by Objector's argument that if all permitted uses are inherently compatible there would be no purpose for requiring conditional use approval. In reviewing conditional use applications, the Board "is permitted to impose [reasonable] conditions on the use of a property to mitigate any potential adverse impacts from the proposed use, and is required to reduce the negative impacts to an acceptable level[,] if it can, by imposing conditions," *In re Maibach, LLC*, 26 A.3d at 1216, which is exactly what the Board did here. The Board reviewed the Property and the Development and determined that many of the uses permitted in the C Commercial Zoning District are not compatible with respect to the Development or this Property. (Board's Order ¶ 3.) If Objector believed that certain uses permitted in the C Commercial District were not compatible in general or with respect to this Property or Development specifically, it could have presented evidence to that effect. While we acknowledge this is made more difficult by the fact that Applicant does not know the specific tenants of the multi-use buildings, Objector could have presented evidence that certain uses permitted in the C

21

Commercial District would not be compatible, such that the Board could have considered imposing a condition to exclude them. Objector did not.

Accordingly, we conclude the Board did not err in finding the proposed multiple principal uses are consistent and non-conflicting except for those identified in its order.

B. Whether the Board erred in concluding the Development would not materially increase traffic.

Second, Objector argues there is not substantial evidence to support the Board's conclusion that the Development would not "materially increase traffic congestion on the streets" as required by Section 195.27.1(E) of the Ordinance. Upon review, we conclude there is substantial evidence to support the Board's conclusion that the Development would not materially increase traffic. The Board's conclusion is supported by the testimony of Applicant's Traffic Engineer. Applicant's Traffic Engineer estimated the new trips attributable to the Development would be between 899 and 1,107. (R.R. at 382a; *see also* FOF ¶¶ 93-94.) He testified that Sumneytown Pike was improved in 2009, 2010, or 2011 and that the improvements contemplated the proposed and approved expansion of the grocery store building and gas station by Giant's predecessor. (R.R. at 168a; *see also* FOF ¶¶ 99-100). He concluded that these improvements were able to accommodate the new trips attributable to the Development, which are estimated to be less than the new trips that would have been produced by the proposed expanded and approved, but not constructed, grocery store building and gas station. (R.R. at 169a; *see also* FOF ¶¶ 99-100.) Similarly, Traffic Engineer concluded that the Development would cause an increase in trips through the intersection of Church Road and Sumneytown Pike but that the increase is not material. (R.R. at 178a-79a; *see also* FOF ¶¶ 113,

115.) The Board did not make express credibility determinations; however, it is apparent that it credited the testimony of Applicant's Traffic Engineer as the Board found the Development would not materially increase traffic. While Merck's Traffic Expert estimated a higher number of trips per day and opined that the Development would materially increase traffic, "[i]t is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder"; rather, "the critical inquiry is whether there is evidence to support the findings actually made." *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008).

In its brief, Objector asserts the proposed Development "will materially increase traffic congestion from that which exists today." (Objector's Br. at 25 (emphasis omitted).) The Property is currently vacant and has been vacant for three years. Thus, the Development, as would any development, will increase traffic from that which exists today. However, an increase is not necessarily a "material increase." As we stated in *Joseph*, "[a]n anticipated traffic increase resulting from a proposed use would not on its own defeat a conditional use request." 16 A.3d at 1217. Generally, an increase in traffic is grounds for the denial of a conditional use application only if "there is a high probability that the proposed use will generate traffic not normally generated by th[e] type of use [in contemplation] and that the abnormal traffic threatens safety." *Marr Dev. Mifflinville, LLC v. Mifflin Twp. Zoning Hearing Bd.*, 166 A.3d 479, 484 (Pa. Cmwlth. 2017) (quoting *Accelerated Enters., Inc. v. The Hazle Twp. Zoning Hearing Bd.,* 773 A.2d 824, 827 (Pa. Cmwlth. 2001)) (emphasis omitted). Objector here did not present any evidence before the Board and did not rebut Traffic Engineer's testimony that the Development would not materially increase traffic. Merck's Traffic Expert did not present evidence that

the Development would generate traffic not normally generated by this type of development.

Accordingly, we conclude there was substantial evidence to support the Board's finding that the Development would not materially increase traffic.

## IV.  Conclusion

For the foregoing reasons, we conclude Applicant met its burden of demonstrating that the proposed uses are compatible and non-conflicting and that the Development will not materially increase traffic.  Accordingly, we conclude the Board did not err in granting the Application.

_____

**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Appeal of Provco Pinegood         :
Sumneytown, LLC From the                  :
Decision Dated November 19, 2018          :
of the Board of Commissioners of          :     No. 1251 C.D. 2019
Upper Gwynedd Township                    :
                                          :
Appeal of:  Provco Pinegood               :
Sumneytown, LLC                           :


# **O R D E R**


     **NOW**, December 14, 2020, the Order of the Court of Common Pleas of Montgomery County in the above-captioned matter is hereby **AFFIRMED**.


                                   _____

                                   **RENÉE COHN JUBELIRER,** Judge